## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| CHEROKEE SIMEON VENTURE I, LLC, | Case No. 12-12913 (KG) |
| Debtor. | **Hearing Date: 12/13/12 @ 3:00 p.m.**<br>**Objection Deadline: 12/7/12 @ 4:00 p.m.** |

## EFG-CAMPUS BAY LLC'S MOTION FOR ORDER (1) DISMISSING BANKRUPTCY CASE OR ALTERNATIVELY, (2) TRANSFERRING VENUE TO THE NORTHERN DISTRICT OF CALIFORNIA

EFG-Campus Bay LLC ("EFG") seeks dismissal of this Chapter 11 case as a bad faith filing, not merely because it was filed on the eve of a foreclosure sale but because the Debtor is a defunct shell that has no hope of rehabilitation and is being used by its controlling insider to manipulate remediation and development processes, to the intended prejudice of EFG which holds a blanket, under-secured lien over all the Debtor's assets.

If dismissal is not ordered, EFG alternatively seeks transfer of the case to the United States Bankruptcy Court for the Northern District of California due to the intensely local concerns raised by the remediation and development factors that dominate this case. Those are, and will continue to be, the signature features of this case if it continues. That fact, joined with the fact that all affected parties are resident in, or have offices in, northern California, while there is a complete absence of connections to Delaware other than the defunct Debtor's incorporation, make Northern California not only an available venue, but the only proper one.

I.

**INTRODUCTION**

1.      With limited exceptions discussed below, the Debtor's only asset is an 86-acre parcel of real property located in the City of Richmond, Contra Costa County, California ("Campus Bay", or the "Property")[1]. The Property has a checkered past that is marked by substantial environmental pollution. Little business is conducted on the Property which presently houses only two tenants in part of a laboratory building. A motion the Debtor recently filed will limit operations even further.[2]

2.      The Property is the subject of a *Site Investigation and Remediation Order* issued in 2006 by the California Department of Toxic Substances Control ("DTSC" and the "2006 Remediation Order"). The 2006 Remediation Order imposes obligations to clean up toxic waste (sometimes, the "Remediation") on "Responsible Parties", namely the Debtor, Zeneca, Inc., the Regents of the University of California and Bayer CropScience, Inc. A copy is attached as Exhibit 4.[3] The scope and breadth of that Remediation, however, is not yet determined for several reasons, including the fact that the scope and breadth of the Remediation will be, in part, a function of the future development plan for the Property, which is in a redevelopment zone designated by the City of Richmond. The scope and breadth of the development is also unresolved because it involves zoning, utility placement and other concerns on which the City, County and the public are to be heard. Consequently,

---

[1]      Exhibit 15 to EFG's concurrently filed Request for Judicial Notice ("RJN"); Declaration of Edward Elanjian ("Elanjian Declaration"), ¶ 7.

[2]      RJN Exhibit 17.

[3]      Unless otherwise specified all Exhibits are included in the Elanjian Declaration.

the scope and cost of the remediation work for which the Responsible Parties are liable is not yet fixed. *See Elanjian Declaration*, ¶ 7.

3.    Zeneca, Inc. ("Zeneca") is the Debtor's Manager and Preferred Member.[4] Whereas Zeneca has substantial resources, it does not own the Property; on the other hand, the Debtor owns the Property but is a special purpose entity that has no financial wherewithal and no business future.  In fact, as early as June 2011, the Debtor and Zeneca jointly advised EFG, in no uncertain terms, that the Debtor had no assets and no resources and could not, and would not, handle even basic property management functions any longer.  The Debtor and Zeneca also made clear that Zeneca had no obligation to fund the Debtor and would not do so. *See Elanjian Declaration*, ¶ 15.

4.    Previously, in September 2007, EFG's predecessor issued a $42,000,000 credit facility to the Debtor that was (and is) secured primarily by the Campus Bay Property, together with rents, deposit accounts and insurance policies and proceeds (among collateral that was broadly defined in the conventional manner).[5]  Copies of the Loan Agreement and associated documentation are collectively provided as Exhibit 2.  By March 2010, the Loan Agreement was in default and as a consequence of the pronouncements made in mid-2011, and taking account of the associated circumstances, EFG undertook to have a receiver appointed, to which CSV stipulated, in July 2012.[6]  EFG likewise undertook to pay property taxes and to cover all operating shortfalls (site security, insurance, utilities, etc.).  So far,

---

[4]    Exhibits 5 and 7.

[5]    Elanjian Declaration, ¶ 5.

[6]    Elanjian Declaration, ¶¶ 12 and 16, Exhibit 11.

EFG has expended over $1,700,000 maintaining and protecting the Campus Bay Property, plus it has expended a still greater sum on advisors and lawyers.[7]

5.      As is elaborated below, despite issuance of the 2006 Remediation Order, comparatively little environmental rehabilitation has actually been accomplished.  The long term, definitive remediation plan ultimately will be a function of the development plan, which is primarily the province of the owner of the Property.  CSV, however, plainly cannot develop the Property and Zeneca has refused to support development (by CSV or otherwise).  In fact, while the Debtor submitted proposals to DTSC in 2008 for a remediation plan which contemplated development that would include residential, commercial and industrial structures, those proposals were left largely unattended to and eventually expired.  Meanwhile, since it became the Debtor's Manager in late April 2011, and standing upon the premise that CSV "cannot" develop the Property, Zeneca has caused CSV to put forward neither a remediation plan nor a development plan – into which EFG would have had direct input by reason of CSV's credit default.  Instead, using its role as a separate Responsible Party, Zeneca has promulgated a "cap and fence" solution to the Remediation that essentially would pave over large portions of the Property and severely limit any future use.  This Remediation "solution" is the least expensive approach available but it would materially inhibit EFG's ability to realize value on its defaulted loan.  It is also contrary to the known desires of the City and local community groups in and around Contra Costa County. *See* Elanjian Declaration, ¶¶ 9, 11, 12, 15 and 17-21.

6.      There can be no pretense of a reorganization in this Chapter 11 case (except perhaps by an injection of tens of millions of dollars by Zeneca).  The Property is essentially unsaleable in its present condition and any remediation plan will take years to accomplish –

---

[7]      Elanjian Declaration, ¶ 13.

4

and the Remediation will not be advanced or enhanced by proceeding in Chapter 11.[8]  The

only purpose of the Chapter 11 case is to keep EFG at bay, while Zeneca presses the "cap

and fence" solution.  EFG argues that this is a misuse of the Chapter 11 process, sufficient to

warrant dismissal.

      7.      If the case is nonetheless left open, it should be transferred to California.  Both

of the predominant issues, prospective remediation and development, raise intensely local

concerns that resonate with California state, county and city governmental entities, and with

private parties all of whom are in, or have offices in, northern California.  This includes

tenants, the Contra Costa and Richmond communities and the Debtor's other creditors.[9]

The City of Richmond and the DTSC are both situated in northern California and travel on

public budgets is strained to say the least.  On the other hand, EFG is informed that Zeneca

has an office in Richmond, California and the Debtor's principal place of business is at 655

Montgomery St., San Francisco, CA 94111-2630.[10]  *See* Dun & Bradstreet Report (Exhibit 1)

and Debtor's Operating Agreement § 1.03 (Exhibit 5).  In contrast, nothing ties this case to

Delaware, or anywhere outside Contra Costa County, other than the Debtor's incorporation,

and it is difficult to imagine a case more suited to transfer, given the nature of the signature

issues in the case and the case profile.

/ / /

---

[8]     Elanjian Declaration, ¶ 16.

[9]     RJN, Exhibit 15; Elanjian Declaration ¶¶ 20 and 21.

[10]    Elanjian Declaration, ¶ 4.

DEL 86424223v1

## II.

## FACTUAL BACKGROUND

8.      For one hundred years, between 1897 and 1997, the Property was used by multiple chemical manufacturing companies including Zeneca.[11]  In 2002, Zeneca conveyed the Campus Bay Property to the Debtor.[12]  The members of the Debtor then were Zeneca and Cherokee Simeon Holding Co., LLC.  Cherokee Simeon Holding Co., LLC was the Manager and Zeneca was the Preferred Member.  In or about April 2011, Zeneca exercised its rights under the Debtor's operating agreement and became the Manager of the Debtor.[13]

9.      As is confirmed in CVS's original marketing and solicitation materials that laid out the remediation and development plan it pursued into 2008 (above), the goal of the Zeneca-Cherokee venture was to remediate the site and entitle it for residential and mixed use development.[14]  Initially, the San Francisco Bay Regional Water Quality Control Board ("Water Board") was the governmental agency responsible for overseeing remediation of the Property.  In November 2004, the DTSC and the Water Board agreed to divide oversight of the clean-up, with the DTSC assuming lead oversight, including responsibility for all remediation activities affecting the "upland" area, ground water and surface water. *See* Elanjian Declaration, ¶ 9.

10.     In May 2005, the California Environmental Protection Agency designated the DTSC as lead environmental agency for the entire site. *See* Elanjian Declaration, ¶ 10.

---

[11]      RJN Exhibit 14, question 21; RJN Exhibit 16, page 2.

[12]      RJN Exhibit 16, page 2.

[13]      Elanjian Declaration, ¶ 15; Exhibits 5 and 7.

[14]      An example of those marketing and solicitation materials is provided in Exhibit 6.

DEL 86424223v1

11.    After issuing an investigative order in 2005, the DTSC issued its 2006 Remediation Order in September 2006.[15] The administrative proceeding from which the 2006 Remediation Order arose is still pending in California.[16] According to the Debtor (correctly so), the long term remediation will necessarily involve, among other things, treating and future monitoring of groundwater, localized soil excavation and further investigation and remediation of a surrounding habitat area known as the Freshwater Lagoon.[17]

12.    The September 2007 $42,000,000 credit facility was intended to enable the Debtor to repay debt, to provide working capital and to pay for remediation of the Property.[18] The Loan Agreement includes express provisions that it is governed by California law and that the Debtor consented to jurisdiction in California.[19] The Loan Agreement (and related documentation) gives EFG a comprehensive lien over all the Debtor's assets, including the Campus Bay Property, deposit accounts and the proceeds of an insurance policy where more than $12,000,000 remains to be drawn, according to the Debtor.  In fact, a large sum of the money drawn on the Loan Agreement was used to repay CSV for its purchase of the Property.[20]

13.    In March 2008, the Debtor submitted to DTSC a draft "Feasibility Study and Remedial Action Plan for Lots 1, 2, 3 Campus Bay Site, Richmond, California" ("FS/RAP").

---

[15]    Elanjian Declaration, ¶ 10.

[16]    RJN Exhibit 14, question 17.

[17]    RJN Exhibit 16, page 4.

[18]    Elanjian Declaration, ¶ 5.

[19]    Exhibit 2, 2007 Loan Agreement ¶¶ 11.8 and 11.10.

[20]    Elanjian Declaration, ¶¶ 5, 6 and 16.

This was a significant step toward implementing mixed use development and a consonant

remediation plan. *See Elanjian Declaration,* ¶ 11.

14.    In late 2008, however, the Debtor advised EFG (or its direct predecessor) that

the Campus Bay Project no longer "penciled out" and that it was essentially abandoning the

project. The secured loan was in formal default by no later than March 2010. Among other

things, the default provided EFG the ability to exercise the rights of CSV (the debtor-to-be)

to remediate the Property. Sections 5.12 and 11.5 of the Loan Agreement respectively

provide, in material part:

> 5.12   Remediation Matters.  Without limitation of Lender's rights
> and Borrower's Obligations set forth elsewhere in the Loan Documents,
> Borrower shall: (i) cause the Remediation to proceed with reasonable
> diligence and continuously, with sufficient workers employed and sufficient
> materials supplied for that purpose so that the applicable Remediation is
> substantially completed, as promptly as reasonably practicable....

> 11.15  Performance by Lender/Attorney-in-Fact.  In the event that Borrower
> shall at any time fail to duly and punctually pay, perform, observe or comply
> with any of its covenants and agreements hereunder or under the other Loan
> Documents or if any Event of Default hereunder shall exist, then Lender may
> (but shall in no event be required to) make any such payment or perform any
> such term, provision, condition, covenant or agreement or cure any such Event
> of Default.

*See Elanjian Declaration,* ¶ 12.

15.    Another consequence of CSV's default is that it was unable to draw funds

from the EFG credit facility and it stopped paying many costs of carrying the property, being

unable or unwilling to do so with its own funds. This left EFG to make a series of protective

advances for property taxes, insurance, site security and consultants (among other things).

Between approximately March 2010 and September 2012, EFG advanced at least $1,700,000

8

to protect the Campus Bay Project plus over $2,000,000 more for legal work and other professional advisory services. *See* Elanjian Declaration, ¶ 13.

16.    While not drawing loan advances, CSV did continue to intermittently draw on the insurance policy.[21]  However, in a series of letters dated between June 23, 2011 and August 3, 2011 – shortly after Zeneca became CSV's Manager -- counsel that jointly represented Zeneca and CSV advised EFG, unequivocally, that the Debtor had no assets, no cash and no resources; that it could not and would not manage the Campus Bay Property any longer; that Zeneca had no obligation to fund CSV or its obligations; and that Zeneca would proceed with remediation efforts of its own.  The letters dated June 23 and July 20, 2011 are particularly emphatic. *See* Elanjian Declaration, ¶ 15; Exhibits 8 and 9.

17.    By no later than June 2011, Zeneca and CSV were thus in conflicting positions.  As the owner of the Property and a Responsible Party, CSV is either indifferent to its remediation and disposition because it is defunct and has no financial future, or it is best served by a forward-looking Remediation that allows for effective redevelopment of the Property.  This approach, which would maximize the Property's value, not incidentally is consonant with the interests of the City and civic groups.[22]  It also would afford EFG the greatest likelihood of recovery on its long-defaulted loan.

---

[21]    The Remediation Motion states that the Policy had a $25,000,000 limit, of which approximately $12,000,000 remains. The motion suggests there "may be" an additional $25,000,000 of coverage.  RJN Exhibit 16, page 3 n.2. The motion, however, omits mention of the fact that improper submission of the claim may have eliminated the Debtor's ability to claim two loss incidents against the $50,000,000 aggregate coverage limit. Elanjian Declaration, ¶ 14.

[22]    Exhibit 12 is a letter from the Executive Committee and Toxics Committee of the Richmond Southeast Shoreline Area Community Advisory Group dated September 30, 2011 calling on the DTSC to reject Zeneca's July 2011 FS/RAP. Exhibit 13 is a letter from the Planning Director of the City of Richmond written in July 2012, stating that the Remediation should indeed be geared toward mixed uses, including unrestricted residential uses. Elanjian Declaration, ¶ 18.

9

18.    Zeneca, however, is a Responsible Party that is liable for the Remediation but is not a property owner and has little or no long-term interest in maximizing the value of the Property. Zeneca is far more interested in limiting its clean-up costs than in generating value from the Property or enhancing the Richmond and Contra Costa County communities.

19.    This lock-up left EFG (and its predecessor) with a defaulted loan, the proceeds of which mostly went to the Debtor to repay affiliates of the Debtor, a defunct borrower and no foreseeable prospect of recovery on its loan. Since the Property (collateral) is unsaleable for the foreseeable future and could not be effectively monetized, EFG resigned itself to taking title and holding the Property for long-horizon development. On January 31, 2012, EFG's predecessor filed a verified complaint against the Debtor and its tenants[23] in Contra Costa County Superior Court, seeking judicial foreclosure of the Campus Bay Property and related relief (the "State Court Action").[24]  On July 12, 2012, a receiver, based in San Francisco, was appointed to manage the Property by stipulation.[25]  The State Court Action is still pending. *See* Elanjian Declaration, ¶ 16.

20.    The conflict between Zeneca and CSV was highlighted in July 2011 when Zeneca directed CSV's outside experts and consultants to turn over to Zeneca all their environmental data and test results, for which Zeneca provided no consideration to CSV. As CSV's mixed use and residential FS/RAP (and related materials) expired for want of attention by CSV—even as EFG offered to fund its continued efforts, Zeneca submitted its own FS/RAP in its place. Not only did Zeneca use its new position as CSV's Manager to

---

[23]    EFG did not seek damages against the tenants in the lawsuit but only named them to confirm their interests in the Property. Exhibit 10, page 4.

[24]    *CERF SPVI, LLC v. CSV I, LLC*, case no. 12-00284; Exhibit 10 and RJN Exhibit 14, question 4.

[25]    Exhibit 11 and RJN Exhibit 14, question 6.

tout its cap and fence "solution", but also to directly prejudice EFG. Specifically, EFG was entitled to direct input into submissions by CSV. But instead of working with EFG and respecting its rights, Zeneca circumvented them by letting CSV fail, while it (Zeneca) proceeded on its own.[26] *See* Elanjian Declaration, ¶ 17.

21.    While Zeneca has recently drawn approximately $750,000 of insurance proceeds, apparently for limited remediation testing and investigative work, comparatively little remediation actually has been accomplished since the 2006 Remediation Order was issued. There is no comprehensive remediation plan that the DTSC has approved and Zeneca's initial FS/RAP (July 2011) generated over 50 pages of comments from the DTSC in February 2012, to which Zeneca did not reply until mid-October 2012. And as is noted above, Zeneca's initial FS/RAP also drew objections from the City and community interests. An appreciation of the logistical and administrative aspects of the pending remediation process is an indisputably necessary prerequisite to an informed assessment of the vitality and viability of this Chapter 11 case. *See* Elanjian Declaration, ¶ 18.

22.    The DTSC re-opened the remediation process with an investigative order in 2005 and followed that with its 2006 Remediation Order. While the 2006 Remediation Order contemplates that certain remediation actions are needed regardless of the nature of future uses of the property, in large measure the scope, nature and breadth of the overall remediation work is a function of the anticipated future development of the Property. Thus, there is a remediation plan to be drawn and a separate development (land use) plan to be drawn. Ultimately, the remediation plan will be a function of the approved development plan

---

[26]    These actions, and related ones, obviously raise questions about Zeneca's fulfillment of its fiduciary duties and its ability to guide the debtor-in-possession.

DEL 86424223v1

but unsurprisingly, in reality they are tracked and written more or less concurrently. *See* Elanjian Declaration, ¶ 19.

23.     The development plan is within the purview of the property owner.  Naturally, it takes into account and is affected by local concerns such as zoning, utility access, roads and grading, needs for publicly supported housing, traffic concerns, targeted retail and commercial developments and so on.  The nature of the development plan affects the remediation plan.  To illustrate, if single family residences with in-ground pools and play areas for children are contemplated, the thoroughness of groundwater and toxic cinder remediation is materially different than if the site is to be paved over as a parking lot.  The DTSC needs to learn the nature of the development contemplated before it can finally evaluate a remediation plan's proposed remedies.  *See* Elanjian Declaration, ¶ 20.

24.     It thus behooves the entity looking to formulate a development plan to work with the City and other local concerns, as well as the DTSC relative to a remediation plan.  In view of CSV's utter abandonment of the Campus Bay Project, EFG began doing so, using its rights under the Loan Agreement, in approximately July 2011, in anticipation of acquiring ownership of the Property via foreclosure.  EFG also provided input to the DTSC, in response to requests by the DTSC, on Zeneca's proposed cap-and-fence exit. *See* Elanjian Declaration, ¶ 21.

25.     EFG's efforts were thus proceeding separately, but more or less concurrently, with Zeneca's efforts.  No remediation efforts are being made by the Debtor (and none have been nearly two years). *See* Elanjian Declaration, ¶ 21.

/ / /

*DEL 86424223v1*

III.

## JURISDICTION

26.     This Court has jurisdiction over this motion because it is a core proceeding

under 28 U.S.C. § 157(b)(2)(A).  *In re Rehoboth Hospitality, LP*, 2011 Bankr. LEXIS 3992,

at * 1 (Bankr. D. Del., Oct. 19, 2011) citing *Brizzolara v. Fisher Pen Co.*, 158 B.R. 761, 767

(Bankr. N.D. Ill. 1993).

IV.

## THE BANKRUPTCY CASE SHOULD BE DISMISSED FOR CAUSE

## PURSUANT TO 11 U.S.C. § 1112(b)

27.     Bankruptcy Code § 1112(b) authorizes the dismissal of a bankruptcy case for

"cause".  Although "cause" is not defined in the Bankruptcy Code, § 1112(b)(4) sets forth a

non-exhaustive list of factors that can constitute cause for dismissal.  "A bankruptcy court

has broad discretion under 11 U.S.C. § 1112(b) to dismiss a Chapter 11 case for cause."  *See

e.g., In re Woodbrook Assocs.*, 19 F.3d 312, 316 (7th Cir. 1994).  As is set forth below,

"cause" exists to dismiss this case because (a) it is a bad faith filing; (b) there is great

likelihood of substantial and continuing loss to the estate and (c) the Debtor is unable to

propose a confirmable Chapter 11 plan.  Any of these would be sufficient; all exist here.

### A.     This is a Bad Faith Filing.

28.     In the Third Circuit, it is settled that a lack of good faith in the filing of a

chapter 11 petition constitutes cause for dismissal and that the ultimate burden is on the

bankruptcy petitioner to establish that its petition has been filed in good faith.  *See e.g., In re

Integrated Telecom Express Inc.*, 384 F.3d 108, 118 (3d Cir. 2004); *In re PPI Enters. (U.S.),

Inc.*, 324 F.3d 197, 211 (3d Cir. 2001); *In re SGL Carbon Corp.*, 200 F.3d 154, 159-62 (3d

DEL 86424223v1

Cir. 1999). The burden of proof on a motion seeking dismissal for "cause" is a shifting one. EFG acknowledges that it bears the initial burden. *See Mazzeo v. Lenhart (In re Mazzeo)*, 167 F.3d 139, 142 (2d Cir. 1999) (discussing burden shifting relative to motions seeking relief from the automatic stay "for cause"). However, once good faith is called into question, the burden shifts to the respondent debtor to demonstrate that the bankruptcy case was commenced in good faith. *In re Syndicom Corp.*, 268 B.R. 26, 49 (Bankr. S.D.N.Y. 2001); *In re Muskogee Envtl. Conservation Co.*, 236 B.R. 57, 59 (Bankr. N.D. Okla. 1999) (citations omitted). That burden cannot be satisfied here.

29.     Whether the good faith requirement has been satisfied is a "fact intensive inquiry" in which the court examines "the totality of facts and circumstances" to see where a case "falls along the spectrum ranging from the clearly acceptable to the patently abusive." *SGL Carbon*, 200 F.3d at 162. In performing this analysis, of critical importance are: (a) whether the petition serves a valid bankruptcy purpose, such as preserving a going concern or maximizing the value of the debtor's estate for creditors and (b) whether the petition is filed merely as an attempt to gain a tactical advantage. *Integrated Telecom*, 384 F.3d at 119-20.

30.     While there is no specific test for determining bad faith, "the courts may consider any factors which evidence 'an intent to abuse the judicial process and the purposes of the reorganization provisions' or in particular, factors which evidence that the petition was filed to delay or frustrate the legitimate efforts of secured creditors to enforce their rights." *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir. 1988); *see also Original IFPC S'holders*, 317 B.R. 738, 750 (Bankr. N.D. I11. 2004) ("[c]ourts generally consider the totality of circumstances surrounding a variety of objective and subjective indicators") (citations omitted); *In re 4 C Solutions, Inc.*, 289 B.R. 354, 364 (Bankr. C.D. Ill. 2003)

14

("[t]he two recognized policies underlying Chapter 11 are preserving going concerns and maximizing property available to satisfy creditors") citing *Bank of Am. Nat. Trust and Savings Assn. v. 203 North LaSalle Street P'ship*, 526 U.S. 434, 453 (1999).

31.    In this case, there is no going concern and there is no value in the estate for any creditor except EFG (which is significantly under-secured), and EFG does not want the case continued.  Furthermore, the petition was indeed filed solely to gain a tactical advantage over EFG – but not even by the Debtor, instead by a controlling insider that is concerned about its separate liability to the DTSC and is in a position of conflict with the Debtor.  That is, Zeneca caused the Debtor to file this Chapter 11 case only to muzzle EFG in the remediation and development process because if economically viable development is advocated, *Zeneca's* remediation costs increase.

32.    There is no real doubt about the fact that the Debtor cannot perform any of the functions of a debtor-in-possession, and it has no economic substance around which to reorganize (and certainly none that can emerge from Chapter 11).  The Debtor can do nothing that Zeneca does not animate and Zeneca refuses to animate the Debtor at all.  It is inescapable that the Debtor is nothing but a shell or instrumentality through which Zeneca speaks, acts and shields itself relative to remediation obligations and EFG's rights.  Although subtle at first look, upon scrutiny it is difficult to imagine a more striking case of bad faith.

    B.    <u>Substantial or Continuing Loss to Or Diminution of the Estate Is Grounds To Dismiss This Case.</u>

33.    Dismissal of a bankruptcy case is appropriate where there is "substantial or continuing loss to or diminution of the estate". § 1112(b)(4)(A).  That describes this case too.

15

34.     Rental income from the Campus Bay Property is approximately $10,000 -
$11,000 per month.  This is likely to drop shortly in view of the motion the Debtor recently
filed to (among other things) terminate or reject all leases and tenancy interests.[27]  In
contrast, EFG recently has had to make protective advances of about $40,000 per month to
"carry" the Campus Bay Property, plus it has advanced significant sums for intermittent
expenses such a property taxes.[28]  There is no hope that the Property will come close to
meeting its carrying costs in the foreseeable future and the Property is unsaleable in its
existing, contaminated state.  Marketability and development is years away and the signature
effect of the Chapter 11 case will be to delay EFG's ability to participate in the development
while Zeneca evades (or at least avoids for the near future) its remediation obligations, all at
a loss of $40,000 or more, per month.[29]

35.     These undeniable circumstances essentially define the phrase "loss or
diminution of the estate".

### C.     The Debtor Cannot Propose a Confirmable Plan.

36.     Dismissal of a bankruptcy case is also appropriate where a debtor is unable to
effectuate a plan.  *See Woodbrook Assocs.*, 19 F.3d at 316 ("dismissal is proper if the court
determines that it is unreasonable to expect that a plan can be confirmed in the Chapter 11
case") (citations omitted). Grounds for dismissal exist if it is clear that on the filing date
"there was no reasonable likelihood that the debtor intended to reorganize and no reasonable

---

[27]      Footnote 2, above.

[28]      Elanjian Declaration, ¶ 13.

[29]      Even assuming the Debtor forces all tenants to vacate and thus reduces certain carrying costs, the
monthly loss and consequent diminution of the estate will still be significant.  Property taxes, insurance,
site security and at least some utility charges will continue so even if the monthly loss becomes somewhat
less, it will still continue at a significant rate.

16

probability that it would eventually emerge from bankruptcy proceedings." *C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1309 (2d Cir. 1997); *see also, In re Squires Motel, LLC*, 416 B.R. 45, 49 (Bankr. N.D.N.Y. 2009) ("the standard in this circuit is that a bankruptcy petition will be dismissed if both objective futility of the reorganization process and subjective bad faith in filing the petition are found").

37.     Given the facts and circumstances of this case, the conclusion is inescapable that the Debtor has no reasonable likelihood of a successful reorganization, or even a sale. EFG will not support any plan that does not account for its rights and any cramdown plan is inconceivable.  Not only would any attempt to force a restructured mortgage on EFG fail for basic valuation and capitalization reasons, it would fail because it would be the product of bad faith.  Zeneca has already made clear that it has neither the obligation nor desire to carry the Debtor.[30]  That renders the case unconfirmable from the Debtor's perspective.  Any change of heart now by Zeneca would plainly be an effort to use the plan process for Zeneca's purpose of stiff-arming EFG, not to rehabilitate the Debtor.  It necessarily follows that any such plan would have been filed in bad faith and hence would be unconfirmable. Such has been the case from day one.

**V.**

**IF THIS BANKRUPTCY CASE IS NOT DISMISSED, IT SHOULD BE TRANSFERRED TO THE NORTHERN DISTRICT OF CALIFORNIA**

38.     This Court has frequently ordered venue changed to other jurisdictions where cases presented similar facts, and often where the facts are not as exaggerated as they are here.  Upon consideration of this precedent and an analysis of the legal factors guiding a

---

[30]     Elanjian Declaration, ¶ 15.

17

venue transfer, if the case is not dismissed, this Court should exercise its discretion to transfer it to California.

A.    <u>**Venue is Proper in the Northern District of California.**</u>

39.    Pursuant to 28 U.S.C. § 1408(1) venue is proper in the Northern District of California. This provision states, in relevant part, that venue is proper in the district:

> (1)    in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one-hundred and eighty-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district;
>
> …

The Debtor's principal asset is 86 acres of real property located in Richmond, California.[31] Additionally, the Debtor's principal place of business is in San Francisco.[32] Therefore, venue of this Chapter 11 case is proper in the Northern District of California.

B.    <u>**Transfer of This Case to the Northern District of California Will Advance the Interests of Justice and the Convenience of the Parties.**</u>

40.    Whether to transfer venue of a bankruptcy case is within the sound discretion of the bankruptcy court. *Rehoboth Hospitality*, 2011 Bankr. LEXIS 3992, at \*10, citing *In re Centennial Coal, Inc.*, 282 B.R. 140, 146 (Bankr. D. Del. 2002). While generally there is a presumption in favor of maintaining a debtor's choice of forum, the presumption is weakened when that choice is not directly related to the operative, underlying facts of the case. *Id.*, citing *In re Borden Chem's and Plastics Operating Limited P'ship*, 2004 WL 1887532, at \*2

---

[31]    RJN Exhibit 15; Elanjian Declaration, ¶ 7.

[32]    Exhibit 5, § 1.03.

*DEL 86424223v1*

(Bankr. D. Del. 2004); *Centennial Coal*, 282 B.R. at 144-45; *In re Ocean Properties of Delaware, Inc.*, 95 B.R. 304, 305 (Bankr. D. Del. 1988). The presumption should be considered weakened even further when the chosen venue conflicts with the operative, underlying facts. The movant bears the burden of establishing by a preponderance of the evidence that the transfer to another venue would be in the interests of justice or the convenience of the parties. *Id.*, citing *Hechinger Inv. Co. of Del. v. M.G.H. Home Improvement, Inc.*, 288 B.R. 398, 402 (Bankr. D. Del. 2003); *Centennial Coal*, 282 B.R. at 144; *In re LaGuardia Assocs., L.P.*, 316 B.R. 832, 837 (Bankr. E.D. Pa. 2004).

41.    Bankruptcy courts generally consider the following eight factors in determining whether to transfer venue:

(a) the location of the key parties;

(b) the ease of access to the necessary proof;

(c) the availability of subpoena power for unwilling witnesses;

(d) the expense related to obtaining willing witnesses;

(e) the enforceability of any judgment rendered;

(f) the ability to receive a fair trial;

(g) the state's interest in having local controversies decided within its borders; and

(h) the economics of the estate administration.

*Rehoboth Hospitality,* 2011 Bankr. LEXIS at *11, citing *Borden Chem's*, 2004 Bankr. LEXIS 1251 at *2; *Continental Airlines Inc. v. Chrysler*, 133 B.R. 585, 587-88 (Bankr. D. Del. 1991). Virtually all these factors weigh decidedly in favor of a transfer in this case.

42.    <u>Location of the Parties</u>.  The parties directly impacted by this case are heavily focused or centered in California, and even Zeneca has a northern California office. This

19

45.    This case presents remarkably similar facts – and the geographical difference from one coast to the other magnifies the result in *Standard Tank* where the jurisdictions were close by each other but a change in venue was still warranted.  All of the Debtor's creditors are in California or have a presence there and the Debtor is the subject of an environmentally sensitive proceeding that is pending in California.  These facts alone support transfer of venue to California.

46.    <u>Ease of Access to the Necessary Proof</u>.  The Property in controversy is in northern California.  The Debtor has admitted that the Remediation will require treating and monitoring of groundwater, localized soil excavation and investigation of the surrounding habitat area.[35]  Witnesses related to the environmental and development issues are all located in California.

47.    Additionally, proceedings in the bankruptcy case and the pending DTSC proceeding will likely require information from the Debtor's books and records.  According to the Debtor's SOFA, Cherokee Investment Services in Raleigh, North Carolina either kept or supervised the keeping of Debtor's books and records.[36]  If that is so, the factor is neutral.  However, according to the Debtor's Operating Agreement, its books and records are to be kept in San Francisco.[37]  In no event does the factor weigh against transfer.

48.    <u>The Availability of Subpoena Power For Unwilling Witnesses</u>.  None of the anticipated witnesses in this case reside in Delaware and it is highly probable that all or substantially all potential witnesses reside in California.  Even the Debtor's lead

---

[35]    RJN Exhibit 16, page 4.

[36]    RJN Exhibit 14, question 19.

[37]    Exhibit 5, §§ 6.01, 6.04(a) and Exhibit A.

21

spokesperson, Brian Spiller, lives in Florida.[38] Thus, the subpoena power could be not be

exercised in Delaware. *See Rehoboth Hospitality*, 2011 Bankr. LEXIS 3992 at *13.

      49.    <u>Expenses Related to Obtaining Willing Witnesses</u>. This case raises issues that

revolve around the Property and EFG's claims: remediation in conformity with the pending

administrative action and the 2006 Remediation Order; future development affected by

zoning and other city and county considerations; and the Loan Agreement.  Witnesses

necessary to testify regarding these issues, including those representing interested California

governmental agencies and community groups, would be required to incur significant

expense to travel to Delaware to participate in this proceeding.  These factors were among

the determinative considerations supporting a change in venue in *Ocean Properties*.  In that

case, two entities filed their Chapter 11 cases in the District of Delaware.  While that was a

proper venue, both corporations conducted their business(es) in Miami Beach and all assets

were maintained there.  95 B.R. at 305.  The court ordered venue transferred to the Southern

District of Florida, based on the following findings:

- The majority of creditors, in number and amount, unrelated to the debtors were Florida claimants;
- All assets were located in Florida;
- It would be more economical to administer the estate in Florida;
- Most of applicable non-bankruptcy law was Florida's;
- The collateral for disputed claims was in Florida;
- Witnesses unrelated to the debtor were likely to be in Florida;
- There would be additional costs to bring witnesses to Delaware and difficulties with service of process;
- The Delaware court's need to become acquainted with Florida law would be a waste of the debtors' resources and judicial time; and
- Significant expense would be incurred to retain two or more sets of counsel

*Id.* at 306-07.  All of the findings from Judge Balick's decision to transfer venue in *Ocean*

*Properties* exist here.

---

[38]    Elanjian Declaration, ¶ 4.

22

50.    <u>The Enforceability of Any Judgment Rendered</u>.  A judgment rendered by the California Bankruptcy Court will be enforced to the same extent as one entered by this Court.

51.    <u>The Ability to Receive a Fair Trial</u>.  There is no evidence that this factor is anything but neutral.

52.    <u>California's Interest in Having Local Controversies Decided Within Its Borders, By Those Familiar With Its Law</u>.  Resolution of the issues that dominate this case will require the application of California law, including state and local real estate, redevelopment and environmental law (and regulations), which the California Bankruptcy Court is better positioned to interpret and apply. *See e.g. Rehoboth Hospitality,* 2011 Bankr. LEXIS 3992 at *15; *Ocean Properties,* 95 B.R. at 304.  Moreover, this Court has recognized that bankruptcy courts in other jurisdictions will have the "same expertise and familiarity applying the Bankruptcy Code as this Court". *Rehoboth Hospitality,* 2011 Bankr. LEXIS 3992 at *14.

53.    While bankruptcy courts everywhere are regularly faced with issues that arise in distant locations under the laws of other jurisdictions, the "California issues" in this case are particularly unique to the locale and neighborhoods surrounding the Property.  In contrast to cases where commercial contracts must be interpreted or real property must be sold, this case is almost entirely about the remediation of polluted land and water on the edge of San Francisco Bay and how it will be used in the future.  How California environmental law, zoning law and land use concerns are applied to this unique situation is especially localized in nature.  A state agency is driving the Remediation and a city is involved in zoning, traffic considerations, and deciding what retail, housing and industry should be targeted for its citizens.  The two must work with each other, with the Responsible Parties and with the

23

property owner to integrate development with remediation. Toxic waste remediation is emphatically a localized concern, making the outcome this case of particular importance to the people of California, Contra Costa County, the City of Richmond and the several governmental agencies charged with upholding local laws. *See Rehoboth Hospitality*, 2011 Bankr. LEXIS 3992 at *15.

54.     This case is thus also analogous to *Safety-Kleen (Pinewood), Inc. v. Sumter Cnty, SC (In re Safety-Kleen Corp.)*. 2001 Bankr. LEXIS 1296 (Bankr. D. Del. 2001). In *Safety Kleen*, Judge Walsh transferred an adversary proceeding against Sumter County, South Carolina in which the plaintiff-debtor was seeking a declaratory judgment that it was in compliance with a pre-petition consent order which had resolved state court litigation pertaining to the regulation, zoning and capacity of plaintiff's hazardous waste disposal facility in Pinewood, South Carolina. *Id.* at *1-3. Around the same time as plaintiff's petition in bankruptcy, the South Carolina Department of Health and Environmental Controls (the "DHEC") issued two new orders directed at the facility, the latter of which required that it be shut down. Id. at *3. The plaintiff debtor filed an application with the DHEC to expand its landfill hazardous waste capacity and Sumter County objected to the request as a violation of the consent order. *Id.* at *4. Thereafter, the subject adversary proceeding was filed in Delaware. *Id.*

55.     In *Safety Kleen,* the court considered the conventional factors in concluding that transfer was warranted, but the most significant seemed to be the location of the debtor's assets and the governmental interests implicated. *Id.* at *6 – 14.

> "Pinewood's material asset here is a hazardous waste landfill. Such an operation, with its unique use of real property and attendant impact on surrounding communities, raises local issues not present with a more traditional manufacturing concern that has a more national scope. I am

24

> therefore inclined to agree with Sumter County that the location of the
> Facility within its borders engenders a public policy interest that favors
> transfer under the circumstances."

*Id.* at *10.  Similarly, the significant environmental issues related to the Campus Bay

Property pending in the administrative proceeding give the California governmental agencies

and its people a unique interest in having this bankruptcy case adjudicated in California.

     56.   <u>The Economics of the Estate Administration</u>.  In addition to the estate having

to incur significant travel costs to obtain testimony of witnesses located in California, the

case is centered on the Campus Bay Property.  California environmental and real property

laws will necessarily be implicated in this bankruptcy case and various professionals and

witnesses may have to visit the site.  While all those people and data could be eventually

presented in Delaware, and this Court could eventually become familiar with the unique

aspects of California law pertinent here, it would better serve the interests of the justice, and

the creditors, and would surely conserve money and judicial resources, to have the evidence

presented in California.  *See Rehoboth Hospitality,* 2011 Bankr. LEXIS 3992 at *15-16.  The

transfer of a single asset real estate case to the jurisdiction in which its principal asset is

located has been previously supported by this Court, even where the single asset debtor's

case did not involve the environmental sensitivities that this case exhibits.  *Id.* at *16, citing

*In re Midland Assoc's.*, 121 B.R. 459, 461 (Bankr. E.D. Cal. 1990).  Where those uniquely

local sensitivities exist, transfer of the case is manifestly appropriate.

/ / /

## VI.

## CONCLUSION

The evidence is uniform, that this case serves no rehabilitation purpose and offers no prospect of any reorganization. Its purpose is only to serve an insider, whose goals and desires conflict with not only the Debtor, but the state, city, community and creditor interests.

EFG argues strenuously for dismissal, fashioned in a way that will allow its foreclosure to proceed. The only other alternative course would be to transfer venue to the Northern District of California, which court sits amid the various interested constituencies and, most prominently of all, near the Campus Bay Property.

DATED: November 28, 2012

GREENBERG TRAURIG, LLP

By: _____
Sandra G. M. Selzer (DE # 4283)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
Phone: (302) 661-7000
Fax: (302) 661-7360
Email: selzers@gtlaw.com

And

Diane E. Vulocolo
2700 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Phone: (215) 988-7800
Fax: (215) 988-7801

And

26

BRYAN CAVE LLP
David R. Weinstein
Dena Cruz
Natalie B. Daghbandan
800 West Olympic Blvd., 4th Floor
Los Angeles, CA 90015
Phone:  (213) 572-4300
Fax:  (213) 572-4400

Attorneys for EFG-Campus Bay LLC

27