# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| DERMA PEN, LLC, [1] | ) Case No. 14-11894 (KJC) |
| | ) |
| Debtor. | ) **Hrg. Date: November 19, 2014 @ 1:00 p.m. (Eastern)** |
| | ) **Obj. Due: November 12, 2014 @ 4:00 p.m. (Eastern)** |

## MOTION OF 4EVERYOUNG LIMITED AND STENE MARSHALL TO DISMISS THE CHAPTER 11 BANKRUPTCY CASE PURSUANT TO BANKRUPTCY CODE SECTION 1112(b)

4EverYoung Limited ("4EverYoung") and Stene Marshall ("Marshall" and together with 4EverYoung, collectively the "Movants"), by and through their undersigned counsel, file this motion (the "Motion") to dismiss the above-captioned bankruptcy case (the "Bankruptcy Case") pursuant to sections 105 and 1112(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended and applicable herein, the "Bankruptcy Code").  In support of the Motion, the Movants respectfully state as follows:

### PRELIMINARY STATEMENT[2]

As set forth herein, the relevant facts and circumstances reveal that Derma Pen, LLC (the "Debtor" or "Derma Pen") filed its Chapter 11 petition (the "Petition") not for any valid bankruptcy purpose, but instead to gain a strategic

---

[1]    The debtor in this chapter 11 bankruptcy case is Derma Pen, LLC, and the last four digits of the Debtor's federal tax identification number are 0866.  The location of the Debtor's headquarters and the service address for the Debtor is 3216 So. Highland Drive #200, Salt Lake City, UT 84106.

[2]    Capitalized terms used in the Preliminary Statement that are not defined in the Preliminary Statement are defined below.

litigation advantage. In particular, the Debtor filed its Chapter 11 petition (the "Petition") to evade impending dispositive rulings and a jury trial in ongoing litigation in Utah, to escape its obligation to transfer its key assets, the United States Dermapen trademark (the "Trademark") and www.dermapen.com domain name (the "Domain Name") to 4EverYoung pursuant to the August 2, 2011 Sales Distribution Agreement (the "Distribution Agreement"), and to create sufficient delay to allow the Debtor to fraudulently transfer its entire business – including the Trademark and Domain Name – to a related entity, MedMetics, LLC ("MedMetics"), which is wholly owned by Mr. Anderer. The Court should not countenance this improper use of the Bankruptcy Code to facilitate an illicit transfer of the Trademark, the Domain Name, and the Debtor's operations as a whole.

Indeed, most or all of the factors relevant to a determination of a debtor's good faith demonstrate that the Debtor did not file the Petition in good faith, including, but not limited to, the timing of the Petition; significant prepetition dishonest, deceptive, and improper conduct; the lack of any substantial non-insider creditors; the lack of any pressure exerted by creditors; and the admitted fact that this case presents nothing more than the resolution of a two-party dispute between the Debtor and the Movants. Because the facts overwhelmingly show that the Petition was not filed in good faith, cause for dismissal exists under Bankruptcy Code section 1112(b)(1).

In addition, the case should be dismissed for cause under sections 1112(b)(4)(C) and (b)(4)(F), because the Debtor has not timely complied with its

reporting obligations and appears to be operating without appropriate insurance, which presents a risk to the estate and the public.

## JURISDICTION

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and (b).  This is a core proceeding arising under the Bankruptcy Code pursuant to 28 U.S.C. § 157(b).

2.      The statutory predicates for the relief requested are Bankruptcy Code sections 105(a) and 1112(b).

## BACKGROUND

### I.    Contractual Relationship Between Derma Pen and 4EverYoung

3.      Pursuant to an original equipment manufacturing agreement with the manufacturer of the original Dermapen micro-needling device,[3] 4EverYoung and its affiliated companies are and have been at all relevant times the international suppliers of the Dermapen micro-needling devices, all of which bear the "Dermapen" trademark. 4EverYoung and its affiliates sell the Dermapen products to distributors and customers throughout the world, and have registered the Trademark in approximately forty countries outside of the United States.  Derma Pen and 4EverYoung are parties to the Distribution Agreement, by which 4EverYoung granted to Derma Pen the right to serve

---

[3]      Since filing the Utah Action, the Debtor has obtained a competing micro-needling device from a different supplier and is still labeling such device the "Dermapen."  Despite the Debtor's termination of the Distribution Agreement, despite the fact that the Debtor is no longer a distributor for 4EverYoung, and despite the Debtor's resulting obligation to return the Trademark to 4EverYoung, the Debtor has applied the Trademark to and is now attempting to sell its counterfeit device, trading off the goodwill associated with the Trademark.  The Movants reserve all of their rights to seek damages for the Debtor's ongoing violation of the Lanham Act.

as the United States distributor for the Dermapen device.  See Distribution Agreement, Exhibit A.

4.      The initial term of the Distribution Agreement was two years, with one-year renewal periods commencing automatically thereafter unless either party provided termination notice 60 days in advance of the term expiration.  See id. at § 11.1. During the term of the Distribution Agreement, Derma Pen was allowed to "own" the Trademark and the Domain Name.  See id. at §§ 12.1, 14.6.  However, upon termination of the Distribution Agreement, Sections 12.2 and 14.6 require Derma Pen to offer and sell to 4EverYoung the Trademark and Domain Name.  See id. at §§ 12.2 and 14.6.  As such, when the right to serve as the United States distributor for the Dermapen terminated, the right to use the Trademark and Domain Name also terminated, and were to be transferred to 4EverYoung.

5.      Approximately 60 days prior to the expiration of the Distribution Agreement's two year term, on May 30, 2013, the Debtor sent to 4EverYoung a notice of termination.  See Exhibit B.  Immediately upon receipt of this termination notice and for months thereafter, 4EverYoung repeatedly invoked its right to purchase the Trademark and Domain Name.  See, e.g., Exhibits C and D.

6.      The Debtor responded to these efforts by filing a lawsuit (the "Utah Action") against 4EverYoung, Marshall, and a number of affiliated companies (collectively, the "Utah Defendants") alleging (among other things) that 4EverYoung was infringing the Trademark by selling its own Dermapen device in the United States. See Complaint and Demand for Jury Trial, Utah Action Docket No. 2.  Derma Pen's

litigation strategy in the Utah Action was aggressive, vexatious, and aimed at evading its contractual obligation to convey the Trademark and Domain Name to 4EverYoung upon termination of the Distribution Agreement.

## II.    The Utah Action

### A.    Failure to Disclose Key Provisions of the Distribution Agreement

7.    The Debtor's pattern of deception and non-disclosure became apparent early in the Utah Action.  Specifically, over two months after commencing the Utah Action (without having served the summons or Complaint), the Debtor sought emergency, preliminary relief (the "TRO Motion").  See Motion for Temporary Restraining Order and Preliminary Injunction, Utah Action Docket No. 11.  Shortly after the Debtor's submission of the TRO Motion, the Utah District Court determined that the Debtor had failed to submit a copy of the Distribution Agreement and ordered the Debtor to "immediately file under seal" and send to the court by email a copy of the Distribution Agreement.  See Docket Text Order, Utah Action Docket No. 19.

8.    Although the Debtor filed the Distribution Agreement, the Debtor failed even to mention – let alone plead or discuss – the key provisions of the Distribution Agreement in its Complaint or the TRO Motion.  For instance, Derma Pen did not reference 4EverYoung's unequivocal right to utilize the Trademark outside of the United States, 4EverYoung's right to control the manner in which Derma Pen used the Trademark, or 4EverYoung's right to use the mark even within the United States for certain purposes during the term of the Distribution Agreement.  See generally

Complaint, Utah Action Docket No. 2, and TRO Motion; see also Distribution

Agreement.

9.      The Debtor also failed to disclose the two-year term of the

Distribution Agreement or that either party could terminate the Agreement at the end of

the term by providing 60 days' advance notice to the other party.  See Distribution

Agreement § 11.1.  In addition, the Debtor failed to inform the Utah District Court that

the Distributor Agreement included an express "Consequences of Termination"

provision, which required that, upon "final termination," Derma Pen must "discontinue

all further promotion, marketing and support of the Product(s)."  Id. (emphasis added).

Finally, and most critically, the Debtor did not even mention that, upon termination of

the Distributor Agreement, 4EverYoung has the absolute right to acquire the Trademark

and Domain Name.  Id. §§ 12.2, 14.6.

**B.      Failure to Disclose Voluntary Termination of Agreement and
          4EverYoung's Invocation of Its Purchase Rights**

10.      On top of failing to plead any of the Distribution Agreement's key

provisions, Derma Pen failed to disclose to the Utah District Court that, on May 30,

2013, Derma Pen voluntarily terminated the Distribution Agreement effective August 1,

2013.  See Exhibit B.  Similarly, the Debtor did not reveal to the Utah District Court

that, immediately following its receipt of Derma Pen's termination notice, 4EverYoung

immediately and repeatedly invoked its right to purchase the Trademark and Domain

Name.  See Exhibits C and D.

C.    **The Utah District Court's Denial of the Debtor's TRO Motion and Bifurcation of the Proceedings**

11.    The Utah District Court became attuned to Derma Pen's lack of candor early on in the Utah Action, causing the Court to deny the TRO Motion and remark that, "Restraint is an equitable remedy and it does not appear that [Derma Pen] is entitled to equitable treatment." See Email Correspondence between Hon. Judge Nuffer and Counsel, Exhibit E.

12.    In denying the TRO Motion, the Utah District Court ruled that the parties' rights to the Trademark (and Domain Name) would be determined by the Distribution Agreement:

> This is not a case based simply on trademark rights under United States law. Rather, it is a contract case in which the Agreement between the parties governs the rights and obligations of the parties related to the Dermapen trademark in the United States. Derma Pen's purported trademark rights must be determined in the context of the Agreement; the Agreement cannot be ignored for purposes of Derma Pen's motion.

Memorandum Decision and Order dated October 29, 2013 (emphasis added), Utah Action Docket No. 70, Exhibit F.

13.    In May 2014,[4] the Utah Defendants filed their own motion for temporary restraining order and preliminary injunction (the "Injunction Motion"), by which they sought to compel Derma Pen to comply with its obligation to sell the Trademark and Domain Name to 4EverYoung and to require Derma Pen to stop using

---

[4]    At that stage of the proceedings, the Court had lifted a previously-imposed stay by which it allowed the parties time to investigate the pursuit of the action in the United Kingdom.

the Trademark pending the its compliance with that obligation.  See Motion for

Temporary Restraining Order and Preliminary Injunction, Utah Action Docket No. 142.

14.    Rather than immediately ruling upon the Injunction Motion, the

Utah District Court entered a series of orders by which it bifurcated the proceedings in

order to combine the Injunction Motion with a trial on the merits.  The court then

scheduled a jury trial on the parties' contract claims to begin on August 11, 2014.  See

Memorandum Decision and Order, Utah Action Docket No. 207.  To the extent the

parties sought monetary damages on their contract, those issues were reserved to a later

date and would not be heard at the August 11, 2014 trial.  See generally id.

15.    In connection with the bifurcated jury trial, the Utah District

Court allowed the parties to file dispositive motions and set an expedited briefing

schedule for that purpose.  See id. at 5.  On July 3, 2014, 4EverYoung and the other

defendants filed four motions for partial summary judgment.  On August 4, 2014, the

Utah District Court (i) granted the Utah Defendants' motion for partial summary

judgment on rescission, concluding that Derma Pen was not entitled to rescind the

Distribution Agreement because, among other reasons, the Distribution Agreement had

already been fully performed and terminated, see Memorandum Decision and Order,

Utah Action Docket No. 397 and (ii) granted in part and denied in part Defendants'

motion for partial summary judgment on fraudulent inducement, reducing Derma Pen's

fraudulent inducement claim to a single alleged misrepresentation, see Memorandum

Decision and Order Granting in Part and Denying in Part 4EverYoung's 244 Motion for

Partial Summary Judgment on Fraudulent Inducement, filed under seal.  At the final

pretrial conference on August 5, 2014, the Court indicated that the parties could expect

rulings on the Utah Defendants' two outstanding motions for partial summary judgment

in connection with specific performance in advance of the jury trial set to begin on

August 11, 2014. See Docket Text Minute Entry, Utah Action Docket No. 410.

### III.    The Bankruptcy Case

16.    On Friday, August 8, 2014 (the "Petition Date"), just one business

day prior to the start of the jury trial in the Utah Action and just prior to the Utah District

Court's expected decisions on the two remaining dispositive motions, the Debtor filed its

Petition commencing the Bankruptcy Case.

### A.  Improper Prepetition Conduct Revealed Since the Petition Date

#### 1.  Asset Transfers to MedMetics

17.    As has only recently been revealed, the Debtor is (and has been

for many months) in the process of shifting its entire business to a sister entity,

MedMetics, which is nothing more than a shell created to insulate the Debtor's assets

from creditors.  Moreover, the Debtor has allowed MedMetics to utilize the Trademark

and other company assets for purposes of a joint venture, all without a formal agreement

or compensation for the use of such assets.  See Exhibit G.  See also Transcript of Sept.

12, 2014 Hearing 127:12-21 and 137:5-15, Exhibit H.[5]  MedMetics is wholly owned by

Michael Anderer, the Debtor's former Chairman and owner of an equity interest in the

Debtor.  See 30(b)(6) Deposition 161:7-10, Exhibit I;  see also Deposition Transcript of

---

[5]    For each citation to a transcript herein, only relevant excerpts of such transcripts are attached as
exhibits to the Motion.

Michael Anderer 173:2-3, 181:21-22, Exhibit J; Transcript of Oct. 14, 2014 Hearing 13-18, Exhibit K.

      18.     Rather than obtain the Dermapen product directly from the manufacturer, as it had in the past, the Debtor now allegedly purchases its supply of micro-needling devices through MedMetics. See Transcript of Oct. 14, 2014 Hearing at 55:21-56:19, Exhibit K; Anderer Deposition at 194:12-195:23, Exhibit J. In fact, the Debtor has identified MedMetics as its largest critical vendor. See Docket No. 24. Despite MedMetics' status as a critical vendor, the Debtor initially failed to provide any details regarding MedMetics' status as an insider. Indeed, it was only upon cross-examination by the Movants' counsel that MedMetics' insider status even came to light. See Transcript of Aug. 26 Hearing at 34:9-14, Exhibit L. The Debtor's amended schedules, however, now identify MedMetics as an insider. See Docket No. 129.

      19.     Although MedMetics is the Debtor's purported supplier, MedMetics has no officers or employees. See generally Anderer Deposition, Exhibit J at 180-185; Derma Pen Rule 30(b)(6) Deposition at 160:6-20:, Exhibit I. Instead, to the extent it can be said to have any independent operations at all, MedMetics operates through the Debtor's employees. See Derma Pen Rule 30(b)(6) Deposition at 161:18-22, Exhibit I. Indeed, the Debtor's Chief Operating Officer, Mr. Jones, is identified as the company contact in MedMetics' FDA distributor registration, and the FDA registrations for MedMetics and the Debtor list the exact same address for the Debtor and MedMetics. See FDA Registrations, Exhibit M. Although the Debtor claims that MedMetics has a separate office in the building where the Debtor is located, the "office"

is within the Debtor's offices, consists of just one room, and has no separate entrance.
<u>See</u> Derma Pen Rule 30(b)(6) Deposition at 8:24-10:12, Exhibit I.  No employees work
in the MedMetics' office and there is no signage to identify the office as belonging to
MedMetics.  <u>See</u> <u>id.</u>

     20.    In addition to allegedly serving as the Debtor's supplier,
MedMetics is now the Debtor's proxy (and alter ego) in a joint venture with a Michigan
company known as Biopelle, Inc.  ("Biopelle").  As has just recently been discovered,
the Debtor commenced discussions with Biopelle beginning in about April 2014 about
the possibility of a joint venture.  <u>See</u> Exhibit N.  The purpose of the joint venture would
be to market and sell a combined "Product" consisting of Derma Pen components
(presumably the MDerma device) and Biopelle components.  <u>See</u> Draft Joint Venture
Agreement, Exhibit O.  The joint venture was to be called Advanced Microneedling
Systems, LLP ("AMS"), and upon information and belief the combined product became
known as the "CIT Special."  <u>See</u> <u>id.</u>

     21.    In May 2014, however, the Debtor informed Biopelle that a
"sister company" would need to be substituted for the Debtor in the joint venture due to
the Utah Action.  <u>See</u> Exhibit P.  Accordingly, even though the Debtor personnel
working on the joint venture did not change, and even though the substance of the deal
did not otherwise change, the parties began the process of re-drafting the joint venture
agreement to substitute MedMetics for the Debtor.  <u>See</u> Exhibit Q.

     22.    Despite the purported substitution of MedMetics for the Debtor in
joint venture agreement, the facts make clear that MedMetics is a straw-man for the

Debtor, i.e., an artifice by which the Debtor can continue to do business and participate in the joint venture, while at the same time insulting its assets from creditors and evading its contractual obligations to 4EverYoung. For example, the joint venture press releases and marketing materials reference only Biopelle and the Debtor, not MedMetics, and the name "MedMetics" does not appear at all or appears only in miniscule text at the bottom of the page. The July 7, 2014 press release announcing the joint venture expressly states as follows:

### Biopelle, Inc. and <u>Derma Pen, LLC</u> are pleased to Announce New Partnership: *Advanced Microneedling Systems, LLP*

Ferndale, Mich.- July 7, 2014 – Biopelle, Inc. and Utah-based  <u>Derma Pen, LLC</u> are pleased to announce the formation of the joint venture, Advanced Microneedling Systems, LLP. The partnership will provide a bundled offering of Derma Pen's latest micro-needling device, the MDerma™ FDS http://Dermapen.com/MDerma-FDS, with Biopelle's Tensage® Intensive Serum 40 and LMX4®.

<u>See</u> Exhibit R (emphasis added). The press release goes on to provide information about Biopelle and the Debtor, but does not reference MedMetics at all.

23.    The more recent advertising for the AMS joint venture likewise identifies only the Debtor and not MedMetics. In fact, because production of the Debtor's new MDerma device has apparently been delayed, the AMS joint venture – i.e., "Derma Pen, LLC, together with Biopelle, Inc." – is now offering the Debtor's Dermapen devices to those who have pre-purchased the CIT Special, which will then be replaced by the MDerma when available. The relevant email advertisement released in October 2017 provides in part as follows:



Purchase the Advanced CIT Special before October 31st and receive the current Dermapen™ device.
While supplies last.



Current
Dermapen®
Device

MDerma™ FDS

■ MDerma™ FDS ships automatically when available

■ Keep your current Dermapen® device for free

See Declaration of Brian Marshall at ¶ 8, Exhibit S; and photographs attached thereto.

     24.     The Debtor and Biopelle also had a booth together at a recent trade show in Chicago, Illinois, on October 11-13, 2014. If the name MedMetics appeared anywhere at the trade show, it was not anywhere visible to the casual observer. See Declaration of Brian Marshall ¶ 7 and photographs attached thereto.

     25.     As the Debtor has testified, there are no written contracts reflecting the Debtor's agreement to allow (i) distribution of its devices to AMS customers or (ii) the joint venture's use of the Trademark. See Transcript of Sept. 12, 2014 Hearing at 132:12-134:18, Exhibit H. Despite the lack of any written agreement by which MedMetics or AMS is allowed to utilize the Trademark, when questioned by Biopelle about the impact of the bankruptcy filing by the Debtor on the joint venture, the

13

Debtor's lead attorney in the Utah Action, Samuel Miller, assured Biopelle that "MedMetics has always been a licensee of the Derma Pen, LLC intellectual property and a reseller of certain Derma Pen products, including the DERMAPEN® micro needling device (USPTO Registration Number: 4,096,295). MedMetics contributed this license and resale right to the joint venture with Biopelle." See Exhibit G.

26.    Moreover, although the Debtor's testimony has been less than forthcoming on the point, the Debtor apparently makes no profit in connection with these transactions. See Transcript of Sept. 12, 2014 Hearing at 137:5-9, Exhibit H.

27.    Biopelle has apparently believed that it was dealing with the Debtor and not a separate, unaffiliated entity, throughout the course of their business relationship. See Exhibit T. The confusion stems not only from the fact that MedMetics lacks any of its own employees or offices, but also from the facts that the Debtor trained Biopelle's employees on sales of the CIT Special and the Debtor (not MedMetics) incurred the obligation to pay for such things as hotel rooms in Las Vegas in connection with the training. See Exhibit U.

28.    Biopelle was also led by the Debtor to believe that the sole reason for the Debtor's bankruptcy filing was the Utah Action. Indeed, after a discussion with the Debtor's management, specifically Mr. Jones (the Debtor's Chief Operating Officer), Mr. Milstein, Biopelle's President and CEO, sent an email to Biopelle's employees to inform them of the Debtor's bankruptcy, in which he stated that the Debtor filed the bankruptcy as a result of the litigation and explained that the Debtor's strategy was to

transfer its assets – including the Trademark – to MedMetics to insulate such assets from

the bankruptcy and the Utah Action:

> **From:** Milstein, Elliott
> **Sent:** Tuesday, August 12, 2014 8:50 AM
> **To:** Biopelle Division Ext: 7805
> **Subject:** Clarification of Derma Pen, LLC Bankruptcy Filing
>
> As a strategy in fighting this legal battle, the partners of Derma Pen, LLC formed a new company, Medmetics, LLC, and have transferred most of the assets of Derma Pen, LLC to this new entity, including its ownership of the trademark. But it has been their intention for some time to abandon the Dermapen trademark and develop a new, uncontested trademark. The new company and its name were part of this strategy as well as creating a new trade name, MDerma FDS, for its new generation device. The bankruptcy filing was just another step in this strategy.

Exhibit V (emphasis added).  Indeed, in response to an inquiry regarding whether the

official statement regarding the Debtor's bankruptcy filing should come from

MedMetics, rather than the Debtor, Mr. Milstein responded:  "Not really.  MedMetics

did not declare bankruptcy and no one knows what it is."  See Exhibit W.

> 29.     Consistent with Mr. Milstein's understanding of the purpose of
the bankruptcy, the Debtor apparently has informed its employees that the bankruptcy
filing was a litigation tactic.  See Declaration of Jessica Welker at ¶ 10, Exhibit X.  In
addition, after the bankruptcy was filed, the Debtor's Chief Executive Officer, Michael
Morgan, informed a then-employee (who has since been terminated and thereafter
commenced employment with an affiliate of 4EverYoung) as follows:  "After Derma
Pen filed for bankruptcy, Mr. Morgan instructed me and other employees that, if a
customer called regarding Derma Pen's bankruptcy, I was to inform them that Derma
Pen was being absorbed by its parent, MedMetics, Derma Pen was well funded, and
Derma Pen was conducting business as usual."  Declaration of K. Allen at ¶ 9, Exhibit
Y.  Mr. Jones, the Debtor's CEO, apparently also informed Ms. Allen that the Debtor's

employees would need to reinterview for their positions with MedMetics. See id. at ¶ 10.

30.    In line with Mr. Morgan's directive about how to respond to questions about the bankruptcy, an employee of the Debtor recently informed a potential customer that, the Debtor filed bankruptcy "to protect our trademark from a company trying to use our trademarked name here in the U.S.," and "Yes, we are well funded and the leader in the space with several new products in our line-up." See Exhibit Z.

### 2. The Debtor's Fraudulent Conduct In Connection With The FDA Audit

31.    As part of its alleged impetus for filing the bankruptcy petition, the Debtor has vaguely alluded to a recent audit conducted by the Food and Drug Administration (the "FDA"). See Declaration of Jeremy Jones at ¶ 4, Docket No. 22. By way of background, Derma Pen registers with the FDA as an initial distributer/importer and/or as the repackager/relabeler of the DERMAPEN® micro needling devices and, as such, is subject to FDA regulations and audits. See id. at ¶ 14.

32.    On July 14, 2014, an auditor from the FDA appeared at the Debtor's office to conduct an unannounced audit (the "FDA Audit"). Id. at ¶ 26. According to the Debtor, the Debtor's compliance consultant interpreted the audit results, combined with other actions, to mean that the FDA was preparing to take action with regard to the classification of microneedling devices industry-wide. Id. at ¶ 27. The Debtor also stated that the FDA Audit "raised the possibility that the FDA would

take adverse action against Derma Pen as a going concern which could halt Derma Pen's operation." Id. at ¶ 32.

33.    According to a then-employee of the Debtor, when the FDA arrived to conduct the unannounced audit, Mr. Morgan, the Debtor's Chief Executive Officer, sent a text message to all of the Debtor's staff to announce that the FDA was at the office. See Declaration of Jessica Welker at ¶ 6, Exhibit X.  Mr. Morgan's text further stated that, unless employees had been prepared to talk with the FDA, they should go to Starbucks or upstairs until the FDA left. Id.  The text from Mr. Morgan follows:



34.    When Ms. Welker was upstairs with Mr. Morgan and some of the other employees, Mr. Morgan said that he had $250,000 worth of inventory (in the form of needles) he did not want the FDA to see, and he requested assistance with moving the

inventory to his car. <u>Id.</u> Derma Pen employees Matthew Lach, Michael Lach, and Scott Michaels then left the room, presumably to help Mr. Morgan load the product into his car. <u>Id.</u> at ¶ 8.

35.    On the same day, Mr. Morgan instructed Katie Allen to create a false invoice to make it appear as if the product moved to Mr. Morgan's car had been sold. <u>See</u> Declaration of Katie Allen at ¶¶ 6-7, Exhibit Y. Ms. Allen complied with the request to create the false invoice. <u>Id.</u> at ¶ 6.

36.    The Debtor and Mr. Anderer have been anything but clear when questioned directly about these events. <u>See, e.g.</u>, Transcript of 341 Meeting held on Sept. 12, 2014 (the "September 341 Hearing") at 44:19-21, Exhibit AA ("Question: Are you aware if Mr. Morgan asked employees to remove certain products, so that the FDA wouldn't see them? Jeremy Jones: I am not."); Derma Pen Rule 30(b)(6) Deposition at 61:7-10, Exhibit I ("But I understand that Mike Morgan had a little bit of a panic attack, and he -- I guess he texted employees. I guess he wanted to remove product from the building."); Anderer Deposition at 205:21-23, Exhibit J, ("I even saw the [text messages] . . ., where he [Mr. Morgan] said, 'Should I take all this stuff out of the building?' Because he really flipped out."); <u>Id.</u> at 206:4-5 ("[H]e [Mr. Morgan] was, like, he literally was like, 'Should I leave the building with something?'").

**B. The Debtor's Misdeeds in the Bankruptcy Case**

37.    As the Debtor has repeatedly admitted, its bankruptcy filing was precipitated by two related lawsuits, both of which were initiated by the Debtor. These lawsuits include the Utah Action and a case filed by the Debtor in Florida against similar

parties alleging similar claims.[6] See Declaration of Jeremy Jones at § F (Docket No. 22); see also Exhibit BB ("The bankruptcy filing became necessary after more than fourteen months of extensive litigation surrounding the intellectual property of the Dermapen® brand and Derma Pen, LLC's continued ownership of it (USPTO Registration Number 4096295)"); Transcript of Oct. 14, 2014 Hearing at 93:13-16, Exhibit K (Mr. Walker arguing that transferring venue to Utah is inappropriate and stating "It really is as Your Honor has pointed out a two-party dispute. Notice was given to all creditors. No other creditors weighed in.").

38.    As this Court is aware, the Debtor has delayed for weeks its obligation to respond fully to the discovery issued by the Movants. Although efforts to resolve this discovery dispute are ongoing, to date the Debtor has not provided a single additional document (after the October 14 hearing), nor has the Debtor provided a privilege log. As the Court admonished at the October 14, 2014 hearing, the Debtor's failure to comply with its discovery obligations is not acceptable. Notwithstanding the Court's clear directive, the Debtor still has not complied. The Debtor's ongoing disregard for the Bankruptcy Rules and the Local Rules further evidences the Debtor's intent to use this proceeding to delay any transfer of the Trademark and the Domain Name to the Movants until the value of those assets has been destroyed and the Debtor's transfer of its business to its alter ego, MedMetics, is completed.

---

[6]    The Florida action is styled Derma Pen, LLC v. Equipmed USA, LLC, No. 0:14-cv-60314 (S.D. Fla.).

39.    Since the Petition Date, the Debtor has also failed to comply with the reporting requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Office of the United States Trustee. Throughout the two months the case has been pending, during the various hearings and both 341 meetings, a number of filing deficiencies and inaccuracies have been identified in the Debtor's reporting. The United States Trustee has requested that the Debtor amend the Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules and Statements") multiple times. The Debtor failed (at least initially) to incorporate the following information in its Schedules and Statements:

    i.    payments within 90 days of the bankruptcy filing in the Debtor's Statement of Financial Affairs, see Transcript of September 341 Hearing at 16:1-13, Exhibit AA;

    ii.    payments to insiders in the Debtor's Statement of Financial Affairs, see id. at 16:14-18;

    iii.    the amounts transferred to attorneys in the Statement of Financial Affairs were incorrect, see id. at 21:21-25, 22:1-25, 23:1-6;

    iv.    parties to whom financial statements were issued, see id. at 24:21-25, 25:1-3;

    v.    inventories conducted by the Debtor in its Statement of Financial Affairs, see id. at 25:16-25.

    vi.    no agreement, oral or otherwise, with Biopelle, Inc. was identified in the Debtor's schedules – rather, the Debtor's "agreement" with Biopelle, Inc. was only disclosed during cross examination about a press release that announced a new joint venture between Biopelle, Inc. and the Debtor called Advanced Microneedling Systems, LLC (formed in Delaware by a member of the Debtor) was presented by Movants to the Court, see Transcript of Hearing on Sept. 12, 2014 at 127:11-17, 133:12-25, Exhibit H; and

vii.  no licensing agreement with MedMetics was identified in the
Debtor's schedules – and it still has not been disclosed by the
Debtor – rather, it was uncovered through production received
from Biopelle, Exhibit G.

40.      Upon review of the most recently filed Amended Schedules
(Docket No. 129), the United States Trustee sought yet another amendment to the
Schedules and Statements because the Debtor still failed to provide a list of parties to
whom financial statements were issued. See Transcript of 341 Meeting, Oct. 14, 2014
("October 341 Meeting") at 21:25-22:25, Exhibit CC. Further, on October 3, 2014, the
Debtor filed its Monthly Operating Report for August 2014 (Docket No. 125) (the
"MOR") and the Initial Monthly Operating Report (Docket No. 126) (the "IMOR,"
together with the MOR, the "Reports"), which contain additional deficiencies. Mr.
Jones identified in his deposition multiple areas in which the reports were not clear or
not accurate, including, but not limited to, (i) the amount of legal fees, (ii) research and
development expenses, (iii) the Debtor's assets, and (iv) payroll due and owing. See
30(b)(6) Dep. Exhibit I at 140:13-16; 142:5-10; 142:18-23; 143:1-18. Because of the
Debtor's consistent failure and/or refusal to abide by the reporting requirements, the
meeting of creditors required by Bankruptcy Code section 341 has now been continued
yet again.

41.      Finally, according to the Debtor's Reports, the Debtor is operating
without workers compensation insurance in violation of state law. See August Monthly
Operating Report at 10, Docket No. 125; September Monthly Operating Report at 10,
Docket No. 174.

## RELIEF REQUESTED

42.     The Movants respectfully request that the Court enter an order

dismissing the Bankruptcy Case for cause pursuant to Bankruptcy Code section 1112(b).

## BASIS FOR RELIEF

I.     **Debtor's Bankruptcy Case Should Be Dismissed For Cause Pursuant to Bankruptcy Code Section 1112(b)**

43.     Bankruptcy Code section 1112(b)(1) provides in pertinent part:

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11. U.S.C. §1112(b)(1) (emphasis added).

54.     "It is well settled that a debtor's lack of good faith in filing a

Chapter 11 petition establishes 'cause' for dismissal." In re Dewey Commercial

Investors, L.P., 503 B.R. 643, 650 (Bankr. E.D. Pa. 2013) (citing Santa Fe Minerals, Inc.

v. Bepco, L.P. (In re 15375 Mem'l Corp.), 589 F.3d 605, 618 (3d Cir. 2009) ("Chapter

11 bankruptcy petitions are 'subject to dismissal under 11 U.S.C. § 112(b) unless filed in

good faith . . . .'"); see also NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc.

(In re Integrated Telecom Express, Inc.), 384 F.3d 108, 118 (3d Cir. 2004).

55.     "'[T]he burden is on the bankruptcy petitioner to establish that its

petition has been filed in good faith.'" In re 15375 Mem'l, 589 F.3d at 618 (quoting In

re Integrated Telecom Express, Inc., 384 F.3d at 118); see also In re Jer/Jameson Mezz

Borrower II, LLC, 461 B.R. 293, 298 (Bankr. D. Del. 2011) ("[T]he burden is on the Debtors to establish that they filed their petitions in good faith . . . .").

56.     "'The determination of whether a Chapter 11 case should be dismissed for a Debtor's lack of good faith requires a fact-intensive inquiry in which courts must examine the totality of the relevant facts and circumstances and determine where the petition falls along a spectrum ranging from the clearly acceptable to the patently abusive." In re Phila. Rittenhouse Developer, L.P., No. 10-31201, 2011 Bankr. LEXIS 1930, *25 (Bankr. E.D. Pa. May 25, 2011) (citing In re Integrated Telecom, 284 F.3d at 118).

57.     Although no single factor is determinative, the Third Circuit has held that "'two inquiries . . . are particularly relevant to the question of good faith: (1) whether the petition serves a valid bankruptcy purpose' and '(2) whether the petition is filed merely to obtain a tactical litigation advantage.'" In re 15375 Mem'l, 589 F.3d at 618 (quoting In re Integrated Telecom, 384 F.3d at 119-20); see also In re SGL Carbon Corp., 200 F.3d 154, 165 (3d Cir. 1999) ("[A] Chapter 11 petition is not filed in good faith unless it serves a valid [bankruptcy] purpose," and a petition filed "'merely to obtain tactical litigation advantages is not within 'the legitimate scope of the bankruptcy laws.'" (citation omitted)).

58.     In addition to these two key inquiries, courts frequently consider a variety of other factors to assess whether the debtor is using the bankruptcy process to achieve objectives outside the scope of the bankruptcy laws, see In re SGL Carbon, 200 F.3d at 165, including the following:

(1)    the debtor has few or no unsecured creditors;

(2)    there has been a previous bankruptcy petition by the debtor or a related entity;

(3)    the prepetition conduct of the debtor has been improper;

(4)    the petition effectively allows the debtor to evade court orders;

(5)    there are few debts to non-moving creditors;

(6)    the petition was filed on the eve of foreclosure;

(7)    the foreclosed property is the sole or major asset of the debtor;

(8)    there is no possibility of reorganization;

(9)    the debtor's income is not sufficient to operate;

(10)   there was no pressure from non-moving creditors;

(11)   reorganization essentially involves the resolution of a two-party dispute; and

(12)   the debtor filed solely to create the automatic stay.

In re SB Properties, Inc., 185 B.R. 198, 205 (E.D. Pa. 1995); see also In re Primestone

Inv. Partners, L.P., 272 B.R. 554, 557 (D. Del. 2002) (listing similar factors); In re

Jer/Jameson Mezz, 461 B.R. at 298-99 (applying the factors set forth in In re

Primestone).

59.    In this case, the evidence shows that the Debtor did not file bankruptcy for any valid bankruptcy purpose but instead as a litigation strategy designed to evade the forthcoming rulings in the Utah Action and create sufficient delay to allow the Debtor to complete the transfer of its assets and operations to an alter ego for the apparent purpose of evading the company's creditors.   In fact, most or all of the factors

articulated in In re SB Properties, Inc. militate against any finding that the Debtor acted in good faith.   Therefore, because the Debtor cannot meet its burden to show it acted in good faith, the case should be dismissed.

**A.**     **The Debtor Filed the Petition on the Eve of Trial to Obtain a Litigation Advantage and Create the Automatic Stay.**

60.     In this case, the Debtor filed the petition on the eve of a jury trial to allow the Debtor to evade both the upcoming jury trial and the Utah District Court's forthcoming orders, and to create the automatic stay.   As noted above, the Debtor filed the Petition on the Friday afternoon before a scheduled Monday morning start of a jury trial on certain issues in the Utah Action.   Further, the Utah District Court had previously announced its intent to release potentially case dispositive opinions on the two remaining motions for summary judgment prior to the start of the jury trial. Realizing the potential for additional adverse rulings in the Utah District Court, the Debtor improperly invoked the protections of bankruptcy to avoid these outcomes.

61.     Indeed, the Debtor openly admits this.   Just days after filing the Petition, the Debtor emailed its customers to explain that the bankruptcy meant business as usual and that the bankruptcy was filed "after fourteen months of extensive litigation . . . to protect our rights, assets, and interests."   See Exhibit BB.   The Debtor's employees and its joint venture partner, Biopelle, were likewise informed by the Debtor that the bankruptcy filing was part of the Debtor's overall litigation strategy.   See Exhibits V and X.

62.     Like the debtor's filing in <u>Philadelphia Rittenhouse Developer,</u>
<u>L.P.</u>, which came immediately before an anticipated state court order appointing a
receiver, the blatantly strategic timing of the petition in this case is "perhaps the clearest
possible example of a litigation tactic." <u>In re Phila. Rittenhouse</u>, 2011 Bankr. LEXIS
1930 at *29.  The law of the Third Circuit prohibits petitions filed solely to obtain
tactical litigation advantages.  See <u>In re SGL Carbon Corp.</u>, 200 F.3d at 165; <u>In re 15375</u>
<u>Mem'l</u>, 589 F.3d at 625.  Indeed, because such tactical litigation purposes do not fall
within "'the legitimate scope of the bankruptcy laws,' courts have typically dismissed
Chapter 11 petitions [filed] under these circumstances . . . ." <u>In re SGL Carbon</u>, 200 F.3d
at 165 (quoting <u>In re Marsch</u>, 36 F.3d 825, 828 (9th Cir. 1994)); <u>see also</u> <u>In re Argus</u>
<u>Group 1700, Inc.</u>, 206 B.R. 757, 765-66 (Bankr. E.D. Pa. 1997); <u>Furness v.</u>
<u>Lilienfield</u>,35 B.R. 1006, 1013 (Bankr. D. Md. 1983) ("The Bankruptcy provisions are
intended to benefit those in genuine financial distress. They are not intended to be used
as a mechanism to orchestrate pending litigation.").

63.     Under this well established law, the Debtor's strategic purpose in
filing the bankruptcy petition is alone sufficient to justify a finding of bad faith, and the
petition should be dismissed.

**B.      The Debtor's Prepetition Misconduct Is Indicative of Bad Faith.**

64.     As set forth above, the prepetition conduct of the Debtor's officers
was improper, particularly in connection with the Utah Litigation, the transfer of
business opportunities to MedMetics, and the FDA Audit. This weighs strongly against
a finding of good faith. The Supreme Court has explained that a basic underpinning of

the good faith requirement is the fundamental policy that bankruptcy relief is limited to the "honest but unfortunate debtor." Brown v. Felsen, 442 U.S. 127, 128, 99 S. Ct. 2205, 60 L. Ed. 2d 767 (1979) (quoting Local Loan Co. v. Hunt, 292 U.S. 234, 244, 54 S. Ct. 695, 78 L. Ed. 1230 (1934)); see In re Krohn, 886 F.2d 123, 125 (6th Cir. 1989). Here, the Debtor's prepetition misconduct (which now has spilled over into this proceeding) evidences that the Debtor is not the "honest but unfortunate debtor" entitled to equitable relief.

65.    First, the Debtor's conduct throughout the Utah Action was vexatious, evasive, and improperly motivated, to such an extent that (among other things) the Utah District Court (i) remarked, at the beginning of the case, that it did not appear the Debtor was entitled to equity; (ii) awarded attorney fees and costs to the Movants due to the Debtor's improper handling of the Movants' privileged information; and (iii) invoked sua sponte both Rule 11(b) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1927 in response to the Debtor's steadfast reference to irrelevant material and refusal to focus on relevant issues in the case. See Memorandum Decision and Order Granting 4EverYoung's Motion for Partial Summary Judgment at 19 (Aug. 4, 2014), Exhibit DD.

66.    The Debtor came to the Utah District Court seeking a temporary restraining order for alleged trademark infringement by the Utah Defendants. In its quest to obtain such relief, however, the Debtor concealed many of the essential facts from the Utah District Court, including without limitation the Distribution Agreement itself (which the Debtor submitted only after being ordered to do so), the key terms of

27

the Distribution Agreement, the fact that the Debtor had voluntarily terminated the

Distribution Agreement at the end of such agreement's term, the fact that 4EverYoung

repeatedly invoked its rights to purchase the Trademark and Domain Name, and the

Debtor's refusal to comply with 4EverYoung's invocation. Most fundamentally, the

Debtor failed to reveal that the Distribution Agreement had anything to say about the

Trademark and Domain Name. Instead, in a deliberate effort to mislead the Utah

District Court prior to allowing the Utah Defendants to appear in the case, the Debtor

simply alleged that it "owned" the Trademark and that the Utah Defendants' use of the

Trademark was necessarily infringing. This prepetition misconduct demonstrates the

Debtor's lack of good faith. See, e.g., First Nat'l Bank of Sioux City v. Kerr (In re

Kerr), 908 F.2d 400, 404 (8th Cir. 1990) (defining bad faith as, inter alia, "a pattern of

concealment, evasion," and violations of court orders).

       67.     Second, it has recently come to light that the Debtor has not only

begun the process of fraudulently transferring its operations and key assets – including

the Trademark – to a sister company, MedMetics, but also that the Debtor is using

MedMetics as a stand-in for the AMS joint venture with Biopelle, all for purposes of

shielding the Debtor's assets from creditors and the Movants. The Debtor has

contributed the use of the Trademark, its own Dermapen devices, and the labor of its

officers and employees to the joint venture, but there is no written agreement

memorializing this transaction. Moreover, the Debtor apparently does not profit from

the arrangement. This arrangement allows the AMS joint venture to trade off the

goodwill associated with the Trademark, while at the same time devaluing the

Trademark. That is, by marketing the MDerma as "the most technologically advanced" product and the "new 'standard of care,'" the Debtor is necessarily implying that predecessor products such as the Dermapen devices are inferior. These facts show that the Debtor's scheme is to take advantage of the delay created by the automatic stay to use MedMetics, owned entirely by Mr. Anderer but without officers, employees, or operations of its own, to conduct the Debtor's ongoing business and enable a seamless (but fraudulent) transfer of the Debtor's operations to this new business.

68.     True to form, the Debtor has not been forthcoming about and still has not disclosed many of the critical facts surrounding MedMetics or the AMS joint venture. Indeed, when Mr. Jones was first questioned about the Debtor's relationship to the joint venture, Mr. Jones attempted to avoid the question by asserting that the Debtor had no involvement with the venture, "other than that we're the marketing arm of it." Transcript of September 341 Meeting, Sept. 12, 2014, at 47:1-17, Exhibit AA. Upon further questioning, Mr. Jones dissembled and suggested that Mr. Morgan might have more knowledge about the joint venture.[7] Nonetheless, documents produced by Biopelle in response to a subpoena reveal that Mr. Jones was and remains intimately involved in the AMS joint venture, despite his contrary representations to the Court. See, e.g., Email between Jeremy Jones and Elliott Milstein (Jones approving AMS accounts payable); Emails between Jones and Milstein (discussing allocation of AMS

---

[7]     See Transcript of Sept.12 Hearing at 134:15-22, Exhibit H (Mr. Jones stating that he does not know who is running the joint venture and suggesting that Mr. Milstein or Mr. Morgan would have that knowledge); see also id. at 126:4-24 (Mr. Jones testifying that he does not know if the Debtor authorized use of the Trademark and Dermapen images on joint venture advertisements).

expenses); Email between Jones and Heather Broberg (Jones questioning authorization of representative to modify an AMS customer contract); Emails between Derma Pen employees and Biopelle (Jones copies on emails about AMS press release and emails indicate Jones would respond and "have the say" on adding a product image to the press release), collectively attached as Exhibit EE. This lack of candor and equivocation by the Debtor's Chief Operating Officer, who is also the Debtor's public face in the Bankruptcy Case, further demonstrates lack of good faith.

69.    Finally, the Debtor's prepetition conduct in connection with the FDA further undermines any claim that the Debtor filed the Petition in good faith. On the first day of the FDA Audit, the Debtor's Chief Executive Officer instructed all staff people except those who had been specifically prepared to answer the FDA's questions to leave the premises. The Chief Executive Officer also enlisted the Debtor's employees' assistance in concealing microneedling product from the FDA, by hiding the product in his car. And, perhaps most troubling, the Chief Executive Officer instructed one member of the Debtor's staff to create a false invoice to make it appear to the FDA as if the concealed product had been sold. Upon information and belief, this falsified invoice remains in the Debtor's records and may have been presented to the FDA.

70.    "Congress has never intended that bankruptcy be a refuge for the irresponsible, unscrupulous or cunning individual." In re Rognstad, 121 B.R. 45, 50 (Bankr. D. Haw. 1990). The "good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons (i.e., avoidance of liens, discharge of debts, marshaling and turnover of assets) available only to those

debtors and creditors with 'clean hands.'" <u>Little Creek Dev. Co. v. Commonwealth</u>

<u>Mortgage Corp. (In re Little Creek Dev. Co.)</u>, 779 F.2d 1068, 1072 (5th Cir. 1986); <u>see</u>

<u>also</u> <u>Furness v. Lilienfield</u>, 35 B.R. 1006, 1011 (D. Md. 1983) ("Moreover, a good-faith

requirement protects the jurisdictional integrity of the bankruptcy courts which sit in

equity and therefore demand that a party seeking relief enter with clean hands.").

71.    In sum, the Debtor's prepetition conduct demonstrates a lack of

good faith and warrants dismissal of this case.

### C. The Domain Name and Trademark Are the Debtor's "Principal Assets."

72.    The Debtor has admitted that the Trademark and the Domain

Name are its principal assets. <u>See</u> Jones First Day Declaration at ¶ 30 ("The dual

lawsuits have caused a significant strain on Derma Pen's financials as it fought

vigorously to protect the main assets of Derma Pen its name and trademark."). It is also

undisputed that the Debtor filed the petition on the eve of a jury trial and dispositive

rulings in the Utah Action that would have determined the ultimate ownership of those

assets. That the petition was filed for the primary purpose of shielding the Debtor's

"principal assets," also supports the Debtor's bad faith in filing the Bankruptcy Case.

### D. The Debtor Has Few or No Unsecured Creditors and There Are Few Debts to Non-Moving Creditors.

73.    Nor is the case does the Debtor owe significant amounts to

unsecured creditors other than the Movants. Indeed, aside from the amounts owing to

4EverYoung and the law firms hired by the Debtor for litigation filed by the Debtor, and

excluding debt to insiders, <u>i.e.</u>, the debts allegedly owed to MedMetics and Mr. Anderer

– the debts identified in the Debtor's amended Schedule F are minimal. Virtually every one of the remaining general unsecured creditors is owed less than $20,000. See Amended Schedule F (Docket No. 129).

74.     Additionally, the claims of the unsecured creditors pale in comparison to the amounts owed to the Movants for breach of the Distribution Agreement and for the Debtor's ongoing, post-petition violations of the Lanham Act. This disparity further evidences the Debtor's bad faith. In re Phila. Rittenhouse, 2011 Bankr. LEXIS 1930 at *43 ("The enormity of the disparity [between the debt] makes it highly probative . . . ."). See also In re FSJ Imports, LLC and FSJ, LLC, No. 12-22402, 12-22403 (NLW), 2012 Bankr. LEXIS 3381, **19-20 (Bankr. D.N.J. July 23, 2012) (dismissing chapter 11 case where, among other things, the relatively insignificant amount of unsecured, non-insider claims demonstrated a "lack of financial need for bankruptcy protection"). For this reason as well, the Debtor filed the Bankruptcy Case in bad faith and such Bankruptcy Case should be dismissed.

**E. There Was Little or No Pressure from Non-Moving Creditors.**

75.     When the petition was filed, none of the Debtor's creditors was exerting unusual pressure on the Debtor to pay past due bills. See Transcript of Aug. 26, 2014 Hearing, Exhibit L, at 37:18-25; 28:1-25; 29:1-5 (indicating that just two creditors, Cosmetic Skin Solutions and Hal Media, had threatened to withhold supply, but going on to state that the Debtor had credit terms with both creditors and that no creditor had threatened to lessen or decrease the Debtor's credit terms).

76.     Indeed, the primary trade debts owed by the Debtor were allegedly owed to MedMetics (an insider). Id. at 34:9-23; 35:11-14 (testifying that $79,000 of the $100,000 owed to critical vendors was owed to MedMetics). Despite being owed 79% of the Debtor's outstanding amount due to its critical vendors, MedMetics has never made a demand for payment, formally or informally, either before or after the Petition Date.[8] Id. at 36:15-19. Mr. Jones did testify that he had conversations with MedMetics about the payment of prepetition amounts due. Id. at 35:21-25, 36:1-2; and 37:1-17. However, because MedMetics has no employees, it is difficult to deduce how Mr. Jones could have had conversations with anyone at MedMetics.

77.     Further, Mr. Jones testified at the Debtor's 341 Meeting on September 12, 2014, that at least two of the payments authorized to be made to critical vendors still had not been made. See Transcript of September 341 Meeting, Sept. 12, 2014 at 14:1-11, Exhibit AA (stating that payments have not been made to MedMetics, LLC or Cosmetic Skin Solutions). Accordingly, there was (and is) no pressure from creditors prior to the Petition Date, or during the Bankruptcy Case. Therefore, this factor also weighs against a finding of good faith, and the Bankruptcy Case should be dismissed.

---

[8]     Of course, this lack of any demand is likely because MedMetics is one and the same as the Debtor.

**F. The Debtor Has No Possibility of Reorganization.**

78.     The Debtor has stated that it filed bankruptcy in order to "market

its assets for sale." See Jones First Day Declaration at ¶ 32. As the Debtor has also

represented, its primary assets are the Trademark and Domain Name, the ownership of

which is disputed in the Utah Action. However, the Debtor cannot market assets these

for sale until the ownership of the Domain Name and the Trademark has been decided.

See, e.g., In re Whitehall Jewelers Holdings, Inc., No. 08-11261, 2008 WL 2951974, at

*4 (Bankr. D. Del. July 28, 2008) ("A bankruptcy court may not allow the sale of

property as 'property of the estate' without first determining whether the property is

property of the estate.") (emphasis added). Indeed, it makes practical sense to resolve

the ownership issue prior to marketing the assets for sale because absent resolution of

the ownership issue, bidding would be chilled. Specifically, few good faith purchasers

would presumably be willing to purchase assets that have a cloud of title that the Court

cannot cure through a sale pursuant to Bankruptcy Code section 363 (because equitable

remedies survive a free and clear sale). See, e.g., Folger Adam Sec., Inc. v.

DeMatteis/MacGregor JV, 209 F.3d 252, 264 (3d Cir. 2000) (finding that the equitable

defenses of recoupment and setoff survive a sale of all assets free and clear of all liens

and interests pursuant to section 363(f)); In re Trans World Airlines, Inc., 275 B.R. 712,

719 (Bankr. D. Del. 2002) (finding that claimant's equitable right of recoupment

survived sale); In re West Chestnut Realty of Haverford, Inc., 177 B.R. 501, 506 (E.D.

Pa. 1995) (holding that specific performance of rejected contract may be available, but

determination must be made by court of general jurisdiction under state law).

79.     Moreover, the Utah District Court is the court that should (and ultimately must) decide this issue, and the Utah District Court may make such decision without prejudice to the Debtor. See e.g., Tribune Co. v. Beatty (In re Tribune Co.), 418 B.R. 116, 128 (Bankr. D. Del. 2009) (dismissing argument that debtors would suffer prejudice if another tribunal determined contract disputes that would ultimately impact what property was included in the estate). Among other things, the Utah District Court has wrestled with these facts and this action since the Utah Action was commenced over fourteen months ago. The Utah District Court has already resolved several of the issues in the Utah Action and such litigation may be very near its conclusion. Indeed, the case is ripe for summary judgment or trial on threshold and potentially case dispositive issues. See Memorandum Decision and Order at 1, Utah Action Docket No. 155 (describing threshold claims as potentially "case terminating"). Notwithstanding this, the Debtor filed the Bankruptcy Case precisely to prevent any determination of the parties' rights in the Trademark and the Domain Name. The Debtor further rejected efforts by the Movants to lift the automatic stay to allow the Utah Action to proceed. Until ownership of the Domain Name and Trademark are decided by the Utah District Court, there is nothing to reorganize and little, if anything, to sell.

**G.    This Case Is a Two-Party Dispute.**

80.     Finally, there can be no question that the "reorganization" sought by the Debtor in this case is nothing more than the resolution of a two-party dispute between the Debtor and the Movants. The Debtor's attorney admitted this. See Transcript of Oct. 14, 2014 Hearing at 93:12-13, Exhibit K. The Debtor does not need

the protection of the Bankruptcy Code. Instead, the Debtor is improperly utilizing the Bankruptcy Code to allow it to take time to build and market a new product for its alter ego, MedMetics, while trading off the goodwill of the Trademark it should have transferred to 4EverYoung over a year ago. Under the totality of the circumstances, the Debtor cannot establish that it acted in good faith, and the Bankruptcy Case must be dismissed.

II.     **The Bankruptcy Case Should Be Dismissed For Cause Pursuant to Bankruptcy Code Section 1112(b)(4) Due to the Debtor's Unexcused Failure to Satisfy Timely Filing and Reporting Requirements And The Debtor's Failure to Maintain Required Insurance.**

81.     One of the enumerated factors justifying dismissal of a bankruptcy case is the debtor's "unexcused failure to satisfy timely any filing or reporting requirement established" by the Bankruptcy Code or the Bankruptcy Rules. See 11 U.S.C. § 1112(b)(4)(F). Bankruptcy Rule 1007(b) requires the Debtor to file schedules and a statement of financial affairs within 14 days of the petition date. See Fed. R. Bankr. P. 1007(b). Bankruptcy Rule 2015.3 further requires that the Debtor file a periodic financial report as to the value, operations, and profitability of each entity that is not a publicly traded corporation (or a debtor), in which the estate holds a substantial or controlling interest no later than seven days before the 341 meeting. See Fed. R. Bankr. P. 2015.3.

82.     In this case, the Debtor filed its schedules and statements of financial affairs on Aug. 26, 2014. See Docket No. 43. There were inaccuracies in the schedules and statements, and the Debtor withdrew such filings on August 29, 2014.

See Docket No. 53. On September 2, 2014, the Debtor filed amended schedules and statements. See Docket No. 56. At the initial September 341 Meeting, the U.S. Trustee requested an additional amendment to the schedules as the Debtor had left out key information, including all payments to creditors and insiders preceding the bankruptcy. The Debtor filed those amended schedules (Docket No. 122), only to withdraw them and file another revised version a short time later (Docket No. 129). In addition, it became clear at the most recent 341 Meeting that the Debtor still has not corrected all such identified deficiencies. Transcript of October 341 Meeting at 21:25-22:24, Exhibit CC.

83. Further, the Debtor's Initial Monthly Operating Report and the Debtor's Monthly Operating Report also contain significant deficiencies. Mr. Jones identified in the Rule 30(b)(6) deposition of the Debtor multiple areas in which the reports were either not clear or not accurate, including, but not limited to, (i) the amount of legal fees, (ii) research and development expenses, (iii) the Debtor's assets, and (iv) payroll due and owing. See 30(b)(6) Deposition, 140:13-16; 142:5-10; 142:18-23; 143:1-18, Exhibit I.

84. Another enumerated factor justifying cause to dismiss is failure to maintain insurance necessary to protect the estate and the public. See 11 U.S.C. § 1112(b)(4)(C). The Debtor has continued, upon information and belief, to operate its business in violation of Utah law post-petition by failing to obtain workers' compensation insurance. See August Monthly Operating Report at 10, Docket No. 125; September Monthly Operating Report at 10, Docket No. 174; Utah Code Ann. § 34A-2-201 (employers shall "secure workers' compensation" by "insuring, and keeping

insured"); <u>Anabis, Inc. v. Labor Comm'n</u>, 30 P.3d 1236, 1240 (Utah Ct. App. 2001)

("[t]he requirement to insure and keep insured is mandatory for all employers in Utah").

Mr. Jones testified that he recently learned the Debtor did not have worker's

compensation insurance, but did not specify how the Debtor planning to rectify that

issue. <u>See</u> Transcript October 341 Meeting at 36:22-38:5, Exhibit CC.

85.   The Debtor's repeated failures to disclose information required in

the statements and schedules, failure to accurately complete an initial monthly operating

report or subsequent monthly operating reports, and failure to obtain proper insurance,

specifically workers' compensation insurance as required under Utah law, constitute

independent cause to dismiss the Bankruptcy Case. <u>See, e.g.</u>, <u>In re Daniels</u>, 362 B.R.

428, 435-36 (Bankr. S.D. Iowa 2007) (failure by attorney debtor to carry adequate

malpractice insurance constituted cause to convert case to chapter 7).

## RESERVATION OF RIGHTS

86.   Despite the Debtor's best efforts to avoid producing documents

and answering interrogatories, discovery is ongoing in the Bankruptcy Case.

Accordingly, the Movants reserve their rights to amend or supplement, through and

including the date of any hearing on the Motion, any of the factual recitations or legal

arguments contained herein.

## CONCLUSION

As set forth herein, the Bankruptcy Case should be dismissed.

Significantly, the Bankruptcy Case represents the latest efforts by the Debtor to either

(i) transfer the Trademark and the Domain Name to Mr. Anderer or (ii) sufficiently delay the efforts of the Movants to have the Trademark and Domain Name (both of which belong to 4EverYoung) returned to 4EverYoung long enough to permit MedMetics to take over all of the Debtor's existing business.  Moreover, the Debtor's prepetition fraudulent conduct and abusive litigation tactics have continued undisturbed postpetition.   The Debtor should not be permitted to use the Bankruptcy Code to perpetuate this improper conduct.  Instead, the Court should dismiss this Bankruptcy Case and allow this two party dispute to be resolved in the forum the Debtor originally chose, the United States District Court for the District of Utah.

WHEREFORE, the Movants request that the Court enter an order, substantially in the form annexed hereto, (i) dismissing the Bankruptcy Case, and (ii) granting the Movants such further relief as the Court deems just and proper.

Dated:  October 28, 2014

/s/ Mark L. Desgrosseilliers
Mark L. Desgrosseilliers (Del. Bar No. 4083)
Ericka F. Johnson (Del. Bar No. 5024)
Morgan L. Patterson (Del. Bar No. 5388)
Womble Carlyle Sandridge & Rice, LLP
222 Delaware Avenue, Ste. 1501
Wilmington, DE  19801
Telephone:  (302) 252-4320
Facsimile:  (302) 661-7738
E-mail: mdesgrosseilliers@wcsr.com
E-mail: erjohnson@wcsr.com
E-mail: mpatterson@wcsr.com

and

Christine T. Greenwood
Christopher M. Von Maack
MAGLEBY & GREENWOOD, P.C.
170 South Main Street, Suite 850
Salt Lake City, Utah 84101-3605
Telephone: 801-359-9000
Facsimile: 801-359-9011
E-mail: greenwood@mgpclaw.com
E-mail: vonmaack@mgpclaw.com

Counsel for 4EverYoung Limited and Stene Marshall